UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Carolina Auto Remarketing Services, LLC and Douglas Camburn, | ) ) ) | Civil Action No. 2:17-cv-858-BHH |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **OPINION AND ORDER** |
| Universal Underwriters Insurance Company, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court on Defendant Universal Underwriters Insurance Company's ("Universal Underwriters") motion for summary judgment. (ECF No. 40.) For the reasons set forth in this Order, Universal Underwriters' motion is granted.

## BACKGROUND

This matter arises out of a claim made by Plaintiffs Carolina Auto Remarketing Services, LLC ("CARS") and Douglas Camburn ("Mr. Camburn") (collectively "Plaintiffs") under insurance policy number 323238 issued by Universal Underwriters to CARS, which was in effect from June 15, 2013 to June 15, 2014 ("the Policy"). Universal Underwriters took the position that coverage under the Policy was limited to $50,000 under the extended theft coverage and Plaintiffs disputed that point. Accordingly, on February 17, 2017, Plaintiffs filed this action in the Charleston County Court of Common Pleas alleging breach of contract and bad faith. Universal Underwriters subsequently removed the action to this Court. (ECF No. 1.)

The Policy provides auto inventory coverage, which includes coverage for loss to covered autos arising out of extended theft. (ECF No. 40-3.) The declarations page states

that the limit for extended theft is $50,000 for each loss. (*See id.* at 7.)

Mr. Camburn formed CARS as an LLC in 2012 and was its sole managing member. (CARS Dep. 21:24-22:10, ECF No. 40-5.) CARS bought automobiles from wholesalers at auction and then sold them to various dealers in and around the Charleston area at a negotiated price for profit. (*Id.* 22:14–25:8.) Once the dealer paid for the automobile and received the bill of sale and title from CARS, it was free to sell the automobile to a third party. (*Id.* 36:9–38:8.)

When CARS was formed, Man Christian ("Mr. Christian"), a former account executive for Zurich American Insurance Company ("Zurich"), the parent company of Universal Underwriters, assisted CARS in obtaining an insurance policy for the policy period June 15, 2012 to June 15, 2013 ("the 2012 Policy"). (Christian Dep. 45:8–48:24, ECF No. 40-6.) The 2012 Policy provided a variety of coverages including auto inventory coverage and coverage for extended theft of covered autos. The limits for extended theft were $50,000 per loss with a $1,000 deductible. The 2012 Policy was renewed in 2013, and the limits for extended theft remained the same. (*See* Ferrao Dep. 82:1-83:20, ECF No. 40-7.)

The Policy's auto inventory coverage (coverage part 300) provides, in pertinent part:

> ***Insuring Agreement***
>
> WE will pay for LOSS of or to a COVERED AUTO or COVERED WATERCRAFT located within the policy territory at the time of LOSS, from any cause, except as stated otherwise in the declarations or excluded, including sums an INSURED legally must pay as damages as a result of LOSS to a CUSTOMER'S AUTO or CUSTOMER'S WATERCRAFT.
>
> . . . .

***Definitions***

When used in this coverage part:

A. "AUTO" means any type of land motor vehicle, (whether crated or not), trailer or semi-trailer, farm tractor or implement, each including its equipment and other equipment permanently attached to it.

. . . .

D. "COVERED AUTO" means an AUTO:

> 1. owned by or acquired by YOU; or
> 2. not owned by YOU, but in YOUR care, custody, or control.

. . . .

I. "EXTENDED THEFT" means:

> 1. YOUR voluntarily parting with evidence of title or possession of a COVERED AUTO or COVERED WATERCRAFT when induced by:
>
>> a. a forged or counterfeit instrument received in payment.
>> b. a check or other instrument written on a closed account.
>> c. any document related to a purchase, rental, or lease transaction on which the name, social security number or signature of the purchaser, rentee, or lessee is false or forged.
>> d. any other criminal scheme, criminal trick, or criminal device which induces YOU, at that time, to part with evidence of title to or possession of the COVERED AUTO or COVERED WATERCRAFT.

. . . .

K. "LOSS" means direct and accidental physical loss or damage, occurring during the coverage part period. LOSS, with respect to a CUSTOMER'S AUTO or CUSTOMER'S WATERCRAFT, includes resulting loss of use.

With respect to EXTENDED THEFT, all transactions, with any one person, organization, group of individuals or ring will be deemed one LOSS. . . .

. . . .

(ECF No. 40-3 at 55–56.) The auto inventory coverage part further states:

**The Most We Will Pay**

Regardless of the number of INSUREDS, premiums charged, claims made, suits brought, AUTOS or WATERCRAFT insured, or amounts awarded against an INSURED, the most WE will pay for any one LOSS to COVERED AUTOS and COVERED WATERCRAFT is the least of the following:

. . . .

D. from EXTENDED THEFT, the limit stated in the declarations for that peril.

. . . .

(*Id.* at 60.)

In February 2015, CARS made a claim with Universal Underwriters due to an alleged fraudulent scheme perpetrated by several related used car dealerships and individuals: Best Friends Enterprises, LLC; Best Friends Auto Sales; Friendly Deals Auto Sales; Bates Family Enterprises, LLC; Genfriend LLC; Beverly J. Bates; and Sean C. Bates (the "Bates entities"). It is undisputed that the Bates entities are all related to one another and involve an overlapping set of actors. The claim related to the Bates entities having sold automobiles received from CARS to consumer purchasers without the titles and without paying CARS, or by attempting to pay CARS with checks drawn on accounts with insufficient funds. (*See* CARS Dep. 47:5-48:13.) Defendant contends that after making the claim with Universal Underwriters, CARS failed to pursue the claim and it was closed.

In July 2015, CARS sued the Bates entities in the Berkeley County Court of Common Pleas—*Carolina Auto Remarketing Services, LLC v. Best Friends Enterprises, LLC,* Case No. 2015-CP-08-1561 (the "Underlying Lawsuit")—alleging that between December 3, 2013, and February 19, 2015, the Bates entities engaged in multiple acts of

fraud and automobile theft of thirty-eight vehicles valued at $355,370, which led to loss and damage to CARS. (Underlying Compl. ¶ 10–20, ECF No. 40-8.) In particular, CARS alleged that the Bates entities "engaged in one fraudulent scheme with multiple fraudulent and deceptive acts." (*Id.* ¶ 13.) Plaintiffs obtained default judgments in the Underlying Lawsuit against the Bates entities in the sum of $1,078,366.28, including attorneys' fees and treble damages under the South Carolina Unfair Trade Practices Act. (*See* ECF No. 41 at 2–3.)

In September 2016, CARS provided Universal Underwriters with the judgments it obtained against the Bates entities. (Compl. ¶¶ 16–17, 30, ECF No. 1-1.) Upon receipt of the judgments, Universal Underwriters advised CARS that the Policy limited coverage to $50,000 for the extended theft claim. (*Id.* at ¶ 31.) Plaintiffs disagreed that coverage was limited to $50,000 and filed this action against Universal Underwriters. Specifically, Plaintiffs contend that the facts giving rise to the judgments constitute multiple "losses" under the Policy and, therefore, they are entitled to an amount in excess of the $50,000 extended theft limit. (*Id.* ¶¶ 39, 57.)

On November 7, 2019, Defendant filed its motion for summary judgment. (ECF No. 40.) Plaintiffs filed a response in opposition on November 21, 2019. (ECF No. 41.) Defendants filed a reply on December 13, 2019. (ECF No. 44.) This matter is ripe for review and the Court now issues the following ruling.

## <u>LEGAL STANDARD</u>

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that

summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

Plaintiffs assert two causes of action against Universal Underwriters: (1) breach of contract; and (2) bad faith. The Court will address Defendant's motion for summary judgment with respect to each claim in turn.

## I. Breach of Contract

Under South Carolina law, "[t]he elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (1962)). The parties do not dispute the existence of a mutually binding contract in this case, or that Plaintiffs suffered loss due to the actions of the Bates entities. Rather, the central issue in dispute is whether Universal Underwriters' coverage obligation arising from the Bates entities' conduct is limited to one $50,000 amount under the Policy's extended theft provision, or whether each automobile misappropriated by the Bates entities triggers its own $50,000 limit.

In South Carolina, "[i]nsurance policies are subject to the general rules of contract construction," and the "cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Auto Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 141 (S.C. Ct. App. 2015) (quoting *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012)). "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." *Id.* Where the terms of an insurance policy are ambiguous or conflicting, courts must construe those terms "liberally in favor of the insured and strictly

against the insurer." *Id.* In other words, "where policy provisions may be reasonably interpreted in more than one way, the court must use the interpretation most favorable to the insured." *CAMICO Mut. Ins. Co. v. Jackson CPA Firm*, No. 2:15-cv-1823-PMD, 2016 WL 7403959, at *8 (D.S.C. Dec. 22, 2016) (citing *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 136 (S.C. Ct. App. 2000)). "'[T]he Court will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print.'" *State Farm Fire & Cas. Co. v. Morningstar Consultants, Inc.*, C.A. No.6:16-cv-01685-MGL, 2017 WL 2265919, at *2 (D.S.C. May 24, 2017) (quoting *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 407 (2014)) (alteration in original). However, "[this] doctrine is not a rule granting substantive rights to an insured when there is no doubt as to the meaning of policy language," *id.* (quoting *Bell*, 757 S.E.2d at 407), and "the insurer's duty under a policy of insurance . . . cannot be enlarged by judicial construction." *Id.* (citing *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. 1990)). "[C]lauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be 'understood in its most inclusive sense.'" *Cook v. State Farm Auto. Ins. Co.*, 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) (quoting *Buddin v. Nationwide Mut. Ins. Co.*, 157 S.E.2d 633, 635 (1967)). "Courts should not, however, 'torture the meaning of policy language in order to extend' or defeat coverage that was 'never intended by the parties.'" *Cook*, 656 S.E.2d at 786-87 (quoting *Torrington Co. v. Aetna Cas. & Sur. Co.*, 216 S.E.2d 547, 550 (S.C. 1975)). "The court's duty is limited to the interpretation of the contract made by the parties themselves

regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their interests carefully." *B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999) (quotation marks, alteration, and citation omitted).

Applying these rules of construction, the Policy provides that the most Universal Underwriters will pay under extended theft coverage is $50,000 per "loss." (*See* ECF No. 40-3 at 7, 55–56, 60.) The declarations page states that the limit for extended theft is $50,000, and coverage part 300 indicates that the most Universal Underwriters will pay for extended theft is the limit stated in the declarations for that peril. (*Id.* at 7, 60.) Defining "loss" with respect to extended theft, the Policy states that "*all transactions*, with any one person, organization, group of individuals or ring will be deemed *one LOSS*." (*Id.* at 56 (emphasis added).) Plaintiffs do not dispute that the misappropriation of the vehicles at issue by the Bates entities all arose from transactions with "one . . . group of individuals or ring;" indeed the complaint in the Underlying Lawsuit alleges as much:

> From December 3, 2013, until February 19, 20145 [sic] the [Bates entities] engaged in *one fraudulent scheme with multiple fraudulent and deceptive acts* to get around a dedicated agreement with [CARS], including, but not limited to, the theft of [CARS's] automobiles and the fraudulent inducement of [CARS] to part with the possession of automobiles to be placed in the possess of the [Bates entities] for later sale without paying for the title to the automobiles.

(Underlying Compl. ¶ 13, ECF No. 40-8 (emphasis added).)[1] Accordingly, the Court finds that unambiguous terms of the Policy dictate that the scheme perpetrated by the Bates entities qualifies as a single "loss" under the Policy, regardless of the number of transactions or automobiles involved.

---

[1] This is also consistent with Mr. Camburn's deposition testimony as a Federal Rule of Civil Procedure 30(b)(6) witness, in which he stated that he believed the dealerships were part of the same company owned by Mr. Bates. (*See* CARS Dep. 31:21–32:17, 33:8-13.)

Nevertheless, Plaintiffs contend that prior to the Policy being issued, Mr. Camburn contemplated the exact type of loss scenario for which they are now seeking insurance coverage, inquired of  Mr. Christian as to the application of the Policy, and that Mr. Christian misled Mr. Camburn by indicating that each transaction between CARS and a dealer would trigger a separate "loss" subject to coverage. (*See* ECF No. 41 at 7–8.) Advancing a theory of equitable estoppel, Plaintiffs claim that a genuine dispute of material fact prevents the entry of summary judgment because Mr. Camburn was ignorant as to the Policy's coverage limit applicable to the loss scenario at issue, relied on Mr. Christian's misleading representations that extended theft like that perpetrated by the Bates entities would constitute multiple "transactions" and that Plaintiffs' damages would not be limited, and that such reliance was to the detriment of CARS and Mr. Camburn when Universal Underwriters denied Plaintiffs' claim for coverage stemming from the Bates entities' fraud. (*See id.* at 9–15.)

Plaintiff's equitable estoppel theory arises from an email exchange that occurred in May and June 2013. On May 30, 2013, Mr. Camburn sent an email to Greg Ferrao ("Mr. Ferrao")—who is listed as an insured on the Policy for uninsured motorist and underinsured motorist coverage (*see* ECF No. 40-3 at 5, 10)—with the subject, "Question from potential investor":

> A potential investor in the business has posed an insurance related question to me that I need to get clarified. Preferably in response to the email so they can see the full chain of events in getting the correct answer. The question is this. . .
> Say that we have several cars going to a dealer who is in the process of getting the bills of sales [sic] written up but who has not paid us for the cars, nor have we given him the titles. Let's say this dealer is unscrupulous and sells the cars quickly, without the titles, pockets the money, closes up shop and heads for the Bahamas. Though was [sic] he did was a felony, the state would most likely let the consumer keep the cars since they paid the dealer,

so in that case, we would forfeit the titles and lose the money we paid for the cars. I ask this because I have heard something similar to this happened once a few years back and several people went to jail for it but the wholesaler lost ownership of the cars and the money he paid for them. It may have been covered by his insurance company, but I don't know the whole story so I am trying to make sure I understand what seems to be a complex situation and to make sure I assess our exposure properly.

If this happened, what would our exposure be? Would we lose all the money for those cars or would it be an insured loss subject to our deductible?

(ECF No. 40-10 at 5–6.) Mr. Ferrao forwarded Mr. Camburn's email to Mr. Christian, stating: "Please call me to discuss." (*Id.* at 4–5.) On June 5, 2013, Mr. Christian responded to Mr. Ferrao in the following manner, copying Steve Murphy ("Mr. Murphy"), who was another insurance executive at Zurich and Mr. Christian's boss at the time:

> Greg,
> Hope you are doing well. Sorry it has taken me so long to get back to you. My computer crashed and I had to send it to home office to be repaired. I just got it back this afternoon.
> Per our conversation last week concerning the question below, the coverage would fall under extended theft under the auto inventory coverage.
> The important fact here is that there was criminal deception or criminal intent involved. Under your scenario below it looks that there would be criminal deception/criminal intent in the selling of your cars. The insurance would be for the value of the cars minus the deductible. If you have any questions, or need more information please let me know.

(*Id.* at 4.) Mr. Ferrao forwarded Mr. Christian's June 5, 2013 email to Mr. Camburn. (*Id.* at 3.) Mr. Camburn replied to Mr. Christian, copying Mr. Ferrao, stating:

> Man,
> One last question just to seek clarification. If we have 6 cars going to a dealer, and we have paid $100,000 for those cars and he sells them to different individuals without the titles in a short period of time, we would get the full value of those cars less a single deductible? I want to verify that we wouldn't be hit with multiple deductibles since it might be claimed that each car was sold/stolen individually and thus we'd be subject to a deductible for every car.

(*Id.*) Mr. Christian replied to Mr. Camburn on June 6, 2013, copying Mr. Ferrao and Mr.

Murphy:

> Hey Doug,
> Hope you are doing well. On the scenario below, the claim would be an Extended Theft claim and under that type of coverage there would be a separate deductible for each transaction. If there were 6 cars and 6 different transaction, [sic] there would be $1000 per car or a $6000 deductible.
> If all the cars were done in one transaction, there would be only a $1000 deductible. The transaction is between you and the dealer, not the customers buying the cars from the dealer. Under regular theft, such as 6 cars are just stolen off a lot, there would be a stop loss of $5000. $1000 per car with a max deductible of $5000. If you have any questions, or need more info, please let me know.

(*Id.* at 2.)

> Based on the content of this email exchange, Plaintiffs argue:

> Defendant's agent indicated that the type of fraud perpetrated by the Bates and Bates' entities would fall under the Extended Theft provisions of the Policy and that each transaction between the Plaintiff and a dealer would constitute a separate transaction, *a separate loss*, and would subject the Plaintiff to the payment of a separate deductible for each transaction.

(ECF No. 41 at 7 (emphasis added).) Moreover, Plaintiffs contend that they "*obtained* and renewed the Policy based on the representation of the Defendant's agent that they would be protected and covered for the exact loss that occurred." (*Id.* at 8 (emphasis added).) In his Rule 30(b)(6) deposition testimony on behalf of CARS, Mr. Camburn stated that he never would have opened the business if he had known the extended theft coverage was limited to $50,000 for the scenario in question. (CARS Dep. 151:11-14, ECF No. 44-3.) In their opposition brief, Plaintiffs argue that they "purchased a policy which they believed would insure against the loss of vehicles by theft or fraud for the full value of the vehicles taken. Due to this belief, no additional insurance was purchased or special premiums paid." (ECF No. 41 at 14.)

The Court finds that Plaintiffs have not demonstrated the presence of a genuine

issue of material fact as to their equitable estoppel theory, and that Universal Underwriters has shown it is entitled to summary judgment on the breach of contract claim. In order to establish a claim for equitable estoppel, the following elements are required: (1) ignorance of the party invoking it of the truth as to the facts in question; (2) representations or conduct of the party estopped which mislead; (3) reliance upon such representations or conduct; and (4) prejudicial change of position as the result of such reliance. *Stringer v. State Farm Mut. Auto. Ins. Co.*, 687 S.E.2d 58, 61 (S.C. Ct. App. 2009). First, it is undisputed that the limit applicable to the extended theft coverage is $50,000 per "loss." The Policy declarations clearly and unambiguously identify that limit. Second, there is no evidence of record that Mr. Christian made any representation that there would be more than $50,000 in extended theft coverage for a single "loss." In fact, Mr. Christian makes no representation as to the amount of coverage for extended theft under the Policy. Rather, the focus of Mr. Christian's email responses was to indicate that the scenario posed by Mr. Camburn would fall under the extended theft provision and to explain the application of the deductible. (*See* ECF No. 40-10 at 2–6.) Third, Plaintiffs' assertion that Mr. Camburn detrimentally relied upon Mr. Christian's emails when he obtained the Policy and founded the CARS business is not supported by the evidence. Mr. Camburn formed CARS in 2012 and obtained the 2012 Policy, with an effective period from June 15, 2012 to June 15, 2013, at or near the same time. The email exchange with Mr. Christian did not occur until approximately one year later in late May and early June of 2013, when the business had already been formed and the precursor to the Policy at issue in this litigation—containing the same extended theft provision and coverage limit—had already been obtained. Plaintiffs have not provided competent evidence to substantiate the

elements of their equitable estoppel theory, and the arguments of counsel that Plaintiffs would have obtained additional coverage if they had known they did not have sufficient coverage for the full value of the vehicles are not evidence. *See Miles v. Salvation Army*, No. 1:12-CV-00176-JMC, 2013 WL 3762899, at *2 n.5 (D.S.C. July 16, 2013) ("Arguments and statements of counsel do not constitute evidence for the purposes of granting or denying a summary judgment motion." (citation omitted)). Accordingly, the terms of the policy apply in a rather straightforward manner to the underlying facts—all fraudulent transactions with the Bates entities are deemed one "loss" and Universal Underwriters did not breach the insurance contract when it offered to pay CARS the $50,000 coverage limit for extended theft.

## II. Bad Faith

In South Carolina,

[t]he elements of an action for bad faith refusal to pay benefits under an insurance contract include: "(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured."

*Cock-N-Bull Steak House v. Generali Ins. Co.*, 466 S.E.2d 727, 730 (S.C. 1996) (quoting *Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 396–97 (S.C. 1992)). "Generally, if there is a reasonable ground for contesting the claim, there is no bad faith in the denial of it." *Mixson, Inc. v. Am. Loyalty Ins. Co.*, 562 S.E.2d 659, 661 (S.C. Ct. App. 2002) (citations omitted). As such, a decision that is incorrect, but reasonably based, does not support a bad faith claim. *See e.g.*, *Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 396–97 (S.C. 1992) (finding that insurer breached the insurance contract

by denying coverage but was not liable for bad faith because its denial of medical coverage based on an investigation of applicant's medical history was not unreasonable). Therefore, an insured must prove there was no reasonable basis to support the insurer's decision to deny benefits. *Cock-N-Bull*, 466 S.E.2d at 730.

To begin, given the Court's finding that Universal Underwriters did not breach the insurance contract by refusing to pay more than $50,000 on Plaintiffs' extended theft claim, the bad faith cause of action fails automatically because there was no refusal to pay benefits due under the contract. However, even if Plaintiffs had been able to show a breach of contract, the evidence of record would not have supported a bad faith claim because Universal Underwriters' offer to pay the $50,000 limit based upon the unambiguous definition of "loss" in the event of extended theft (*see* ECF No. 40-3 at 56 ("With respect to EXTENDED THEFT, all transactions, with any one person, organization, group of individuals or ring will be deemed one LOSS")), could not be deemed unreasonable. Accordingly, Universal Underwriters is entitled to summary judgment on the bad faith cause of action.

## CONCLUSION

After careful consideration of the parties' briefs, the associated record, and the applicable law, the Court hereby GRANTS Defendant's motion for summary judgment (ECF No. 40), and this action is dismissed.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

September 15, 2020
Charleston, South Carolina